# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNIVERSITY OF PITTSBURGH,<br><br>Plaintiff<br><br>v.<br><br>MARC H. HEDRICK, PROSPER BENHAIM, HERMANN PETER LORENZ, and MIN ZHU<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Misc. Action No. 06-080-SLR

(Litigation pending in U.S. District Court, Central District of California – Case No. CV04-9014-CBM (AJWx))

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL RESPONSES TO ITS SUBPOENA DUCES TECUM ON THIRD-PARTY OLYMPUS-CYTORI, INC.

David P. Primack (DE 4449)
DRINKER BIDDLE & REATH LLP
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1254
Telephone: (302) 467-4221
Facsimile: (302) 467-4201

-and-

Joseph R. DelMaster, Esq.
DRINKER BIDDLE & REATH LLP
1500 K Street N.W., Suite 1100
Washington, D.C. 20005-1209
Telephone: (202) 842-8879
Facsimile: (202) 842-8465

Attorneys for Plaintiff
University of Pittsburgh

Dated: May 1, 2006

# TABLE OF CONTENTS

A.  The '231 Patent is Crucial to Olympus's Transaction
    With Cytori and the Formation of the Joint Venture..................…..4

B.  Olympus-Cytori or Its Parent Companies Must Produce Their
    Responsive Documents……………………………………………6

C.  Counsel for Olympus-Cytori has Repeatedly Obstructed Plaintiff's
    Discovery Efforts…………………………………………………..7

Conclusion……………………………………………………...……9

i

Plaintiff University of Pittsburgh (hereinafter "UPITT"), by and through its attorneys, submits this Memorandum of Law in Support of its Motion to Compel Olympus-Cytori, Inc. (hereinafter "Olympus-Cytori") to respond fully to UPITT's Subpoena Duces Tecum and in Reply to Olympus-Cytori's Response in Opposition.

While Olympus-Cytori mischaracterizes many of the events that have led up to UPITT's Motion to Compel, two things it states are certainly true: (1) that the litigation underlying this discovery is concerned with who are the proper inventors of U.S. Patent No. 6,777,231 (the '231 Patent); and (2) UPITT has filed three motions to compel discovery pursuant to Rule 45 against three related non-parties: Olympus-Cytori (here, in the District of Delaware); Cytori Therapeutics, Inc. ("Cytori") (in the Southern District of California); and Olympus Corporation ("Olympus") (in the Eastern District of New York). These three companies, as well as Defendant Marc Hedrick (who also is President of Cytori), are all represented by the same counsel.

These motions were filed because all of these entities have refused to produce clearly responsive documents that would assist UPITT to establish that Defendants – Marc Hedrick, Prosper Benhaim, Hermann Peter Lorenz and Min Zhu – are not the proper inventors of the '231 patent. As this Court will see, obstructing discovery has become a habit for counsel for Olympus-

1

Cytori's and Marc Hedrick. The discovery that UPITT seeks from Olympus-Cytori, as well as Cytori and Olympus, is simple: any and all representations made by Cytori or its President Marc Hedrick regarding the '231 Patent and, in particular its inventorship, its conception and this litigation.

Marc Hedrick, Cytori, Olympus, and their joint venture at issue here, have never stated that such representations were never made or that responsive documents do not exist. Instead, Olympus and Olympus-Cytori refused to produce any documents and Cytori produced three non-public documents:

1.    The first   page of the Joint Venture Agreement that formed Olympus-Cytori on November 4, 2005 (Attached as Exhibit "A" (filed under seal).);

2.    What may be page 46 of the Joint Venture Agreement but because it was produced in a vacuum, its impossible to know  (Attached as Exhibit "B" (filed under seal).); and

3.    A letter purportedly from Olympus – without any letterhead -- giving a value to the license of the '231 patent.  (Attached as Exhibit "C" (filed under seal).) Unfortunately, counsel for the Cytori Parties has not been able to inform UPITT whether the letterhead was redacted or not, which is of some import because if the letter came from Olympus America it would be highly relevant to Olympus's claims that Olympus America was not involved in the transaction.

UPITT has been as reasonable as possible regarding this discovery and, in fact, agreed not to pursue discovery against Olympus, Olympus America or Olympus-Cytori pending the production of documents by Cytori. (*See* Letter dated March 14, 2006 attached as Exhibit "D".) Given the pathetic production by Cytori, however, UPITT is required to go searching for the relevant documents by moving to compel responses from all of the corporate entities where they may exist.[1]

The situation here is simple. If Marc Hedrick or Cytori made any representations regarding the '231 patent and, in particular its inventorship, to Olympus or anyone else, UPITT is entitled to see those representations – no matter where they may be -- to see if they are consistent with his claims in the underlying litigation. Because Dr. Hedrick, Cytori, Olympus and Olympus-Cytori cannot say that such representations were not made, UPITT must ask for them from all of them.

---

[1] UPITT has three motions to compel pending not as part of a "fishing expedition" as Olympus claims but because it has been unable to obtain necessary discovery. UPITT has been forced to chase after documents as obstacles to obscure and prevent production of the documents have repeatedly been put before them by Olympus, Olympus-Cytori and Cytori. Furthermore, it is disingenuous of Olympus's counsel to say they are willing to consolidate while UPITT is not. First, as a matter of law, the parties could not confer jurisdiction to the Trial Court because the courts that issued the subpoenas have *exclusive* jurisdiction. *See* Rule 45; *U.S. v. Star Scientific*, 205 F.Supp. 2d 482, 485 (D.Md. 2002). Thus, the only way to consolidate the actions was by filing a motion before each of the different courts and asking that the motions be transferred, which each court, at its discretion, could do. *See Id.* (noting that jurisdiction is with the court that issued the subpoenas and the while these motions may be transferred by the court, the court issuing them has a "strong interest in the enforcement of its subpoenas."). In addition, UPITT did not want to delay the motions to compel to wait for potential consolidation. The discovery period is completed and the local rules in the Central District of California can take more than a month, further delaying the production of documents that is already long overdue.

**A.    The '231 Patent is Crucial to Olympus's Transaction with Cytori and the Formation of the Joint Venture.**

Olympus-Cytori attempts to deemphasize the importance of the '231 patent by claiming that "the intended function of the joint venture is to develop and manufacture devices to process fat tissue, not to develop products using isolated adipose-derived stem cells (the subject of the '231 patent)." What Olympus-Cytori conveniently forgets to inform the Court is that the '231 patent is a critical cornerstone of its business plan. As Cytori states in its March 30, 2006 10k filing to the SEC:

> For example, in the fourth quarter of 2004, the University of Pittsburgh ("U Pitt") filed a lawsuit naming all of the inventors who had not assigned their ownership interest in Patent 6,777,231 to U Pitt, seeking a determination that its assignors, rather than the University of California's assignors, are the true inventors of Patent No. 6,777,231. *If U Pitt wins the lawsuit, our license rights to this patent could be nullified or rendered non-exclusive with respect to any third party that might license rights from U Pitt, and our strategy related to our regenerative cell technology could be significantly impacted.*

(Pertinent portions of Cytori's March 30, 2006 10k filing are attached as Exhibit "E" (emphasis supplied).) The '231 patent, the only patent that Cytori singles out in its 10k filing, is the centerpiece of its regenerative technology because the reason that the joint-venture is developing devices to process fat tissue is to obtain the adipose-derived stem cells for regenerative purposes. (*See* BioWorld Today, April 27, 2006, p. 7 attached as Exhibit "F" ( Cytori "received a 1.5 million payment for its option it granted to Tokyo-based Olympus Corp. for exclusive right to negotiate an *adipose-*

4

*derived* stem and regenerative cell commercialization collaboration . . . ." (emphasis supplied).) )  Thus, individuals using the joint ventures devices could potentially infringe the '231 patent, which means that the joint venture could be liable for inducing infringement of the '231 patent if it did not have rights to it.

Moreover, many of Cytori's (and now the joint-venture's) patents and patent applications rely upon the '231 patent for their priority date.[2]  If UPITT is successful in the underlying litigation and the Defendants are removed from the patent, Cytori and the joint venture may not only lose their rights to the '231 patent, but they may either lose the rights to several later-filed patent applications.  At best, these patent priority dates will be moved forward, which endangers the patentability or the validity of the patent applications or issued patents, respectively, that arise there from.

Given the importance of the '231 patent not only to the business plan of the joint venture, but to the well being of the joint venture's entire patent portfolio, it is impossible to believe that Cytori, Olympus and Olympus-

---

[2] The term "priority date" can mean several different things.  In essence, the "priority date" of a patent application is the date which controls what prior art affects its patentability. For most patent applications the priority date is the date on which the patent application was filed with the patent office.  However, in certain circumstances a patent application will enjoy an priority date earlier than its own filing date. For instance, a continuation or divisional application will enjoy the filing date of the application of which it is a continuation or divisional.   Or an application may claim priority from a provisional application.   Both of these examples are in play with some of Cytori's patents or patent applications which derive their priority date from a provisional patent application that gave rise to the '231 patent.  If the Defendants are removed from the '231 patent, these other patents and patent applications will lose their link to this earlier priority date and will expose them to additional prior art that may affect their validity and/or patentability.

Cytori did not perform due diligence regarding the inventorship of the '231 patent. Marc Hedrick and Cytori must have made representations regarding the '231 patent and its inventorship – especially considering that the underlying litigation was ongoing before the joint venture was formed.

**B.    Olympus-Cytori or Its Parent Companies Must Produce Their Responsive Documents**

Olympus-Cytori changes its story in its response from not having *any* documents and no employees to not having *any responsive* documents and one newly-acquired employee. (*Compare* Letter dated March 14, 2006 attached as Exhibit "D" to Olympus-Cytori's Response (D.I. 3) at p. 5.) While this may not seem significant by itself, it is yet another example of how Cytori, Olympus and their joint-venture keep changing their story in a constant effort to avoid producing documents and information relevant to this litigation.

Realizing that its admission that it did not have any documents at all demonstrated that the joint-venture was not actually a separate company, but simply a sham for Olympus and Cytori to do business through, the joint venture has changed its story to say that it has no responsive documents. But, if the joint-venture does have documents, would you not expect it to have, at least, its formation documents and the due diligence materials that formed the basis for the transaction that formed it? On the other hand, to the

6

extent it does not have any documents, then the joint venture is nothing more than the combination of its two "parent" companies and they should be compelled to produce documents they have that are responsive to UPITT"s subpoena.[3] *See generally Gerling International Ins. Co. v. Commissioner of Internal Revenue*, 839 F.2d 131, 141-141 (discussing instances when a subsidiary can be made to produce the documents of a parent and stating that when the subsidiary can secure documents from the parent for business needs it should not be allowed to deny control over documents for purposes of discovery).[4] Given the lack of documents and employees that Olympus-Cytori maintains it seems impossible that it is not using the documents of its parents for its own business needs. Its lack of a separate form should not shield it, or its parent companies, from producing documents.

## C.    Counsel for Olympus-Cytori has Repeatedly Obstructed Plaintiff's Discovery Efforts

Sadly, these delay tactics and obstructionist behaviors have become a practice of counsel for Olympus-Cytori, Olympus, Cytori and Marc Hedrick.

---

[3] UPITT notes that while Olympus-Cytori notes that it does not have any responsive documents, it does not state that it never had any responsive documents. UPITT gets the sense that Cytori, Olympus and their joint-venture are playing a "shell game" where they are moving documents and information from one company to another that appears to be the farthest reach for UPITT. Of course, if Cytori, Olympus and their joint venture would simply represent that all of the responsive documents are with one company or at one location, UPITT could narrow its efforts to that company and location. Such a representation has never been made.

[4] This case is in the context of Rule 34, but the scope of Rule 45 is the same in regards to documentary discovery. *See SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000).

He has created obstacles to obstruct UPITT's attempt at receiving

production of the information it needs to prove its case.  Plaintiff has learned

from Adam Katz and Ramon Llull that Mr. Olson approached them, even

though they were clearly adverse to both Cytori and Dr. Hedrick, after this

litigation had commenced and asked them to sign a "Joint Defense,

Common Interest, and Information Sharing Agreement."  One of the express

purposes of this agreement was to impede the disclosure of factual

information germane to this litigation to UPITT.  Specifically, the agreement

states:

> 3.    **NO DISCLOSURE TO THIRD PARTIES OR THE UNIVERSITY OF PITTSBURGH** – **No Privileged or Confidential Information provided by any Party to any other Party pursuant to this Agreement shall be disclosed to third parties (including, without limitation, any litigant in the Pittsburgh litigation not a party hereto)** by any Party receiving such information unless the receiving Party has first obtained the written consent of the Party who provided the information pursuant to this Agreement.  Nothing in this Agreement shall preclude any Party from communicating Privileged or Confidential Information to his or her counsel, providing that the counsel does not also represent the University of Pittsburgh.

Exhibit "G" (emphasis supplied).  This agreement demonstrates that from

the beginning of this litigation, one of the aims of Marc Hedrick and his

counsel Mr. Olson was to prevent the truth from reaching Plaintiff so that it

would be hindered from thoroughly and zealously advocating its case before

this court. Plaintiff requests that the court keep this in mind while it is considering Plaintiff's request for full and complete discovery as well as while it evaluates Olympus's claims that such discovery is available from and has been provided by other parties.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court summarily grant its Motion and order Olympus-Cytori to produce documents in response to Plaintiff's Rule 45 subpoena duces tecum, no later than five (5) business days from the date of the Court's order. Further, Plaintiff respectfully requests that this Court find that any documents responsive to Plaintiff's subpoena that are in the possession, custody and control of either Olympus or Cytori, be deemed in the possession, custody and control of Olympus-Cytori and that such documents will be produce pursuant to the Plaintiff's subpoena.

Dated: May 1, 2006   _____/s/ David P. Primack_____
         David P. Primack (DE 4449)
         DRINKER BIDDLE & REATH LLP
         1100 N. Market Street, Suite 1000
         Wilmington, DE 19801-1254
         Telephone: (302) 467-4221
         Facsimile: (302) 467-4201

         -and-

Joseph R. DelMaster
DRINKER BIDDLE & REATH LLP
1500 K Street N.W., Suite 1100
Washington, D.C. 20005-1209
Telephone: (202) 842-8879
Facsimile: (202) 842-8465

Attorneys for Plaintiff
University of Pittsburgh

# EXHIBIT A

# SEALED
# DOCUMENT

# EXHIBIT B

# SEALED DOCUMENT

# EXHIBIT C

# SEALED DOCUMENT

# EXHIBIT D

## DrinkerBiddle&Reath
L L P

Kathryn R. Doyle, Esquire
215-988-2902
Kathryn.Doyle@dbr.com

*Law Offices*

One Logan Square
18th and Cherry Streets
Philadelphia, PA
19103-6996

215-988-2700
215-988-2757 fax
www.drinkerbiddle.com

NEW YORK
WASHINGTON
LOS ANGELES
SAN FRANCISCO
CHICAGO
PRINCETON
FLORHAM PARK
BERWYN
WILMINGTON

March 14, 2006

**Via E-Mail and First Class Mail**

Jeffery M. Olson, Esq        James B. Lewis, Esq.
SIDLEY AUSTIN LLP            BINGHAM MCCUTCHEN
555 West 5th Street          1900 University Avenue
Suite 4000                   East Palo Alto, CA 94303-2223
Los Angeles, CA 90013-1010

Jennifer M. Phelps, Esq.
BINGHAM MCCUTCHEN
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071-3106

RE:    **Confirmation of 3/13 Conference Call Discussions**
       *University of Pittsburgh v. Hedrick*, 04-9014-CBM (AJWx)

Dear Counsel:

I write to memorialize our discussion that we had on the telephone this afternoon. Jay DelMaster, John Marshall, George Awad, David Kessler and I were on the call for plaintiff and the three of you were on the phone for defendants and several third-parties.

**University of Pittsburgh Discovery Requests**

We agreed to conduct Mark Hedrick's deposition on Thursday, March 23 and Cytori Therapeutics Inc.'s ("Cytori") / Christopher J. Calhoun's deposition/ on Friday, March 24 in San Diego. You have agreed to produce documents for Marc Hedrick (to the extent any exist) and Cytori in the next few days. While you did not have an opportunity to review our subpoena of Mr. Calhoun before the conference call, on our representation that the subpoena's scope was substantially similar to the Cytori subpoena, you believed that you would be able to produce any of his documents in advance of his deposition on March 24.

You represented that you did not plan on producing any documents from Olympus and that you recommended that we review the documents produced by Cytori before pushing further for Olympus documents. We agreed to wait and review Cytori's documents to see if we needed additional documents from Olympus before seeking assistance from the court based on your representation that we would have the Cytori documents in the next few days. If we believe that we need additional documents after reviewing the Cytori documents, we will let you know as soon as reasonably possible.

*Established
1849*

PHLIT\555275\1

DrinkerBiddle&Reath
L L P

Jeffery M. Olson, Esq.
James B. Lewis, Esq.
Jennifer M. Phelps, Esq.
March 14, 2006
Page 2

Based upon your representation that the Cytori/Olympus Joint Venture (JV) has
no employees and possesses and/or controls no documents that are not in the possession
and/or control of Cytori, we agreed there was no reason to conduct a deposition or obtain
documents of the JV. Thus, we will hold the subpoena in abeyance unless its is
discovered that the JV possess unique documents or information.

You agreed that UC will produce documents in the next ten days, by March 23,
and that the deposition of UC's designee, Mr. Shih, will hopefully be in San Francisco on
March 27. Can you confirm his availability by tomorrow?

We broached the issue of Hedrick paying our expenses for his agreed-upon
deposition for which he failed to appear. You explained that we would need to get a
Court order to obtain that money.

**Defendants Discovery Requests**

All of the CellSource materials that we agreed we would produce – the pleadings
and the deposition transcripts of John Johnson and Alan Garfinkel – have been produced
to Defendants.

Pursuant to your second 30(b)(6) Deposition Notice, we agreed to produce Fran
Connell on March 30 and another designee to respond to non-objectionable portions of
your Deposition Notice on March 31, both in our offices in Philadelphia. We will serve
you with formal objections to your new 30(b)(6) Notice by tomorrow.

With respect to your letter dated March 10, you requested clarification regarding
U. Pitt's responses to your Second Set of Document Requests and Interrogatories. With
respect to the document request responses, U. Pitt. does not expect to produce any
additional documents in the face of your requests except: (1) we are still attempting to
attempt to obtain relevant and responsive notebooks from Dr. Llull; and (2) we are
completing our search for electronic documents in the possession or control of U. Pitt.
We hope to have an answer to both of these inquiries by the end of Thursday and, to the
extent relevant, responsive, non-objectionable, non-privileged documents are found, they
will be produced to you as soon as reasonably possible thereafter. Of course, if
unexpected additional documents surface that are relevant, responsive, non-objectionable
and not privileged, we are obligated (just as you are) to supplement our production and
will do so.

DrinkerBiddle&Reath
L L P

Jeffery M. Olson, Esq.
James B. Lewis, Esq.
Jennifer M. Phelps, Esq.
March 14, 2006
Page 3

With respect to your request regarding the Defendant's Second Set of
Interrogatories, we initially stated that we did not think that the responses need
clarification and that if you disagreed, you should seek relief from Court. However, in
the spirit of cooperation, we will supplement our responses by Friday, March 17. We do
not, however, plan to dissect deposition transcripts. Rule 33 requires that we need to
specify the documents "in sufficient detail to permit the interrogating party to locate and
identify, *as readily as can the party served*, the records from which the answer may be
ascertained." Given that the depositions were attended by both of us, we have equal
familiarity with them and it seems unnecessary to parse them for you. If you disagree,
please let me know.

As for expert discovery, we agreed to stick to the Court's schedule and that we
would schedule depositions after the reports had been served by the parties.

As for the depositions of John Johnson and Marcille Pilkington, we have decided
that given all the other ongoing discovery and the crowded schedules of all the counsel in
this case that we will forego using there testimony at trial so their depositions will not be
necessary.

\*                    \*                    \*

On an administrative note, it appears that there may have been some
miscommunication between the parties regarding service. To alleviate this problem in
the future, could you do us the courtesy of carbon copying David Kessler in our
Philadelphia Office on all correspondence and pleadings in this action regardless to
whom the letter or pleading is directed. This will ensure that we do not have any letters
that are not reviewed if a lawyer is temporarily absent from his or her office. Likewise, if
there is a central person, outside the primary lawyers in this action, that you want us to
copy on all correspondence and pleadings, we would be happy to provide the same
courtesy.

Please let me know as soon as possible if you believe I have omitted anything or
inaccurately summarized our discussions.

Very truly yours,

Kathryn R. Doyle

PHLIT\555275\1

# EXHIBIT E

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

(Mark One)

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

**OR**

o     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission file number 0-32501

# CYTORI THERAPEUTICS, INC.

(Exact name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **DELAWARE** | 33-0827593 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **3020 CALLAN ROAD, SAN DIEGO, CALIFORNIA** | 92121 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(858) 458-0900**

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common stock, par value $0.001**

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes o No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes o No

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

© 2006. EDGAR Online, Inc.

Indicate by check mark whether the registrant is an accelerated filer or a non-accelerated filer as defined in Rule 12b-2 of the Exchange Act. Large Accelerated filer o Accelerated filer o Non-accelerated filer

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes o No

The aggregate market value of the common stock of the registrant held by non-affiliates of the registrant on June 30, 2005, the last business day of the registrant's most recently completed second fiscal quarter, was $29,991,417 based on the average of the reported high and low sales price of the registrant's common stock on June 30, 2005 as reported on the Frankfurt Stock Exchange, of 2.53 Euros, or $3.05 per share, based on the exchange rate in effect as of such date.

As of January 31, 2006, there were 15,401,865 shares of the registrant's common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive proxy statement for the 2006 Annual Meeting of Stockholders, which will be filed with the Securities and Exchange Commission within 120 days after the end of the year ended December 31, 2005, are incorporated by reference in Part III, Items 10, 11, 12, 13 and 14 of this Form 10-K.

**Intellectual Property**

Our success depends in large part on our ability to protect our proprietary technology and information, and operate without infringing on the proprietary rights of third parties. We rely on a combination of patent, trade secret, copyright and trademark laws, as well as confidentiality agreements, licensing agreements and other agreements, to establish and protect our proprietary rights. Our success also depends, in part, on our ability to avoid infringing patents issued to others. If we were judicially determined to be infringing any third party patent, we could be required to pay damages, alter our products or processes, obtain licenses or cease certain activities.

To protect our proprietary regenerative cell technology we have filed applications for 27 United States patents, as well as 68 corresponding international patent applications. We are also the exclusive, worldwide licensee of the Regents of the University of California's rights to one U.S. Patent (Patent No. 6,777,231) related to isolated adipose derived stem cells that can differentiate into two or more of a variety of cell types, and five related U.S. patent applications and 26 corresponding international patent applications. With respect to our bioresorbable implant products and technology, we have obtained 13 U.S. patents, three of which were sold in product line dispositions. Our three U.S. patents related to the design of our macro-porous bioresorbable sheets for skeletal repair and regeneration were issued in July1999, August 2001 and March 2004. Our three U.S. patents for the design of our high torque bioresorbable screws were issued in August 2001, February 2002 and November 2002. Our U.S patent related to our membrane with tissue guiding surface corrugations was issued in May 2002. Our two U.S. patents related to our bioresorbable barrier film for the control of postsurgical adhesions were issued in March 2003 and January 2004 and assigned to MAST as part of the Thin Film product line sale agreement. Our U.S. patent related to stereotaxic detachable needle extensions was issued in June 2003. Our U.S. patent related to non-scatterable radio-opaque material for imaging applications was issued in October 2003. Our U.S. patent related to a resorbable posterior spinal fusion system was issued in April 2004. Our U.S. patent for a cranial flap fixation device was issued in June 2004 and assigned to Medtronic pursuant to the September 2002 CMF product line sale agreement. We also have two Australian patents related to our bioresorbable mesh, one Australian patent for the design of our high torque bioresorbable screws and another Australian patent related to our membrane with tissue guiding surface corrugations. Our four Australian patents were issued in August 2000, January 2003 and September 2003. Each of our patents will expire 20 years from the filing date of the original patent application. In addition, we have filed applications for 15 additional U.S. patents as well as 42 corresponding international patents relating to our bioresorbable technology.

We cannot assure that any of the pending patent applications will be issued, that we will develop additional proprietary products that are patentable, that any patents issued to us will provide us with competitive advantages or will not be challenged by any third parties or that the patents of others will not prevent the commercialization of products incorporating our technology. Furthermore, we cannot assure that others will not independently develop similar products, duplicate any of our products or design around our patents. U.S. patent applications are not immediately made public, so we might be surprised by the grant to someone else of a patent on a technology we are actively using.

Patent law outside the United States is uncertain and in many countries is currently undergoing review and revisions. The laws of some countries may not protect our proprietary rights to the same extent as the laws of the U.S. Third parties may attempt to oppose the issuance of patents to us in foreign countries by initiating opposition proceedings. Opposition proceedings against any of our patent filings in a foreign country could have an adverse effect on our corresponding patents that are issued or pending in the U.S. It may be necessary or useful for us to participate in proceedings to determine the validity of our patents or our competitors' patents that have been issued in countries other than the U.S. This could result in substantial costs, divert our efforts and attention from other aspects of our business, and could have a material adverse effect on our results of operations and financial condition. We currently have pending patent applications in Europe, Australia, Japan, Canada, China, Korea, and Singapore, among others.

Patent litigation results in substantial costs to us and diversion of effort, and may be necessary from time to time to enforce or confirm the ownership of any patents issued or licensed to us or to determine the scope and validity of third party proprietary rights. If our competitors claim technology also claimed by us and prepare and file patent applications in the United States, we may have to participate in interference proceedings declared by the U.S. Patent and Trademark Office or a foreign patent office to determine priority of invention, which could result in substantial costs to and diversion of effort, even if the eventual outcome is favorable to us. For example, in the fourth quarter of 2004, the University of Pittsburgh ("U Pitt") filed a lawsuit naming all of the inventors who had not assigned their ownership interest in Patent 6,777,231 to U Pitt, seeking a determination that its assignors, rather than the University of California's assignors, are the true inventors of Patent No. 6,777,231. If U Pitt wins the lawsuit, our license rights to this patent could be nullified or rendered non-exclusive with respect to any third party that might license rights from U Pitt, and our strategy related to our regenerative cell technology could be significantly impacted. We expect to incur substantial legal costs as a result of U Pitt lawsuit, and our president, Marc Hedrick, M.D., is a named individual defendant in that lawsuit.

In addition to patent protection, we rely on unpatented trade secrets and proprietary technological expertise. We cannot assure you that others will not independently develop or otherwise acquire substantially equivalent techniques, or otherwise gain access to our trade secrets and proprietary technological expertise or disclose such trade secrets, or that we can ultimately protect our rights to such unpatented trade secrets and proprietary technological expertise. We rely, in part, on confidentiality agreements with our marketing

© 2006. EDGAR Online, Inc.

partners, employees, advisors, vendors and consultants to protect our trade secrets and proprietary technological expertise.

7

© 2006.  EDGAR Online, Inc.

# EXHIBIT F

ed, 04/26/06 08:30:46PM From: American Health Consultants To: LINDA-JEAN SCHNEIDER

BIOTECH'S MOST RESPECTED NEWS SOURCE FOR OVER 15 YEARS

# BioWorld® Today

THURSDAY
APRIL 27, 2006

**THE DAILY BIOTECHNOLOGY NEWSPAPER**

VOLUME 17, NO. 81
PAGE 1 OF 7

---

*Rising Interest For Gene Therapy?*
## HIV Study Adding African Site For Targeted Genetics' Product

**By Aaron Lorenzo**
**Washington Editor**

HIV researchers are enlisting a gene therapy product in an expanding study that's under way in southern Africa.

The newest portion of the trial is a collaborative effort between the Zambia Emory HIV Research Project, the International AIDS Vaccine Initiative (IAVI) and Targeted Genetics Corp. to test the safety and immunogenicity of a preventive HIV vaccine, tgAAC09. The product is Targeted Genetics' and based on HIV subtype C, the subtype of the virus most prevalent in southern Africa.

It employs a recombinant adeno-associated viral (AAV) vector to deliver select HIV genes. The naturally occurring virus is seen as advantageous because of its harmless profile; its wild type is non-pathogenic and is not associated

*See Gene Therapy, Page 3*

---

*Competition Aiming To Dice Up Market*
## Alkermes Starts Phase III Of Inhaled Insulin Product

**By Karen Pihl-Carey**
**Senior Staff Writer**

After the January approval of the first inhaled insulin product in the U.S., Alkermes Inc. and others have forged ahead with their own programs in hopes of gaining a share of a multi-billion-dollar diabetes market.

Now Cambridge, Mass.-based Alkermes appears to be positioned to bring to market the second inhaled insulin product, its AIR Inhaled Insulin System (AIR system). It has started an additional Phase III registrational study in Type II diabetes patients that will compare A1C – an average measure of glucose over a three-month period – between the AIR system and injectable pre-meal insulin.

Alkermes began its Phase III pivotal program last July.

"I'm expecting approval in calendar year 2009, and I

*See Inhaled Insulin, Page 4*

---

## FivePrime, BI Enter Deal In RA Worth Up To $75M

**By Jennifer Boggs**
**Staff Writer**

In its first major discovery partnership, FivePrime Therapeutics Inc. could receive more than $75 million from partner Boehringer Ingelheim as the companies collaborate to identify therapeutics for rheumatoid arthritis.

San Francisco-based FivePrime entered a two-year research and license agreement with the pharma firm, during which FivePrime will use its rapid protein discovery system to find targets and therapeutics that Boehringer could choose to license.

Although the companies did not break down the $75 million, FivePrime is "very pleased with the arrangement," said Gail Maderis, president and CEO of the privately held firm. "This provides significant funding for us in the way of research support," and was structured as "an industry-stan-

*See FivePrime, Page 5*

---

## For Replikins, Replication Data Allow For Predicting Epidemics

**By Jennifer Boggs**
**Staff Writer**

Founded within the last month and based on technology aimed at predicting epidemics, Replikins Ltd. has developed a software program for calculating the spread of influenza strains and is preparing to launch animal studies involving the first of its synthetic vaccines targeting the flu.

Work at the Boston-based start-up focuses on its namesake, replikins, which are viral peptides that can be measured by their rate of replication to determine the potential of specific virus strains becoming global epidemics.

Although virus replication has been studied for 50-plus years, it's only recently that researchers have discovered the replikins, said company founder Samuel Bogoch, a

*See Replikins, Page 6*

---

INSIDE: ● OTHER NEWS TO NOTE (BIOGEN IDEC REPORTS EARNINGS) ...................5, 7
● CLINIC ROUNDUP ............................................................2-4

THOMSON

---

To subscribe, please call BioWorld® Customer Service at (800) 688-2421; outside the U.S. and Canada, call (404) 262-5476.
Copyright © 2006 Thomson BioWorld®. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

ed, 04/26/06 08:30:46PM From: American Health Consultants To: LINDA-JEAN SCHNEIDER

# CLINIC ROUNDUP

• **Adherex Technologies Inc.,** of Research Triangle Park, N.C., initiated a proof-of-mechanism trial of eniluracil. The study, which will be conducted at the University of Alabama at Birmingham, is expected to involve up to 20 patients and provide data on the effects of low doses of eniluracil in tumor tissue. Adherex is developing eniluracil to improve the therapeutic value and effectiveness of the cancer drug 5-fluorouracil. The trial is the second of three studies planned for this year to optimize Adherex's method of administration for the combination of eniluracil and 5-FU with the goal of returning eniluracil to Phase III in 2007.

• **Alexza Pharmaceuticals Inc.,** of Palo Alto, Calif., initiated a Phase I trial of AZ-003 (Staccato fentanyl) to test the product's safety in about 50 healthy volunteers. AZ-003 is an inhalation product being developed for patients with acute pain episodes, including patients with breakthrough pain and postoperative pain.

• **Array BioPharma Inc.,** of Boulder, Colo., initiated a Phase I trial of its small-molecule candidate, ARRY-438162, an MEK inhibitor for inflammatory disease. The product will be evaluated in dose-escalation studies in healthy volunteers.

• **CardioVascular BioTherapeutics Inc.,** of Las Vegas, signed a research and development agreement with Miami-based **bioRASI**, a clinical research organization, to initiate proof-of-concept studies of its lumbar ischemia drug candidate containing Cardio Vascu-Grow in patients suffering from chronic back pain. The trial will enroll patients who have blockages in their lumbar arteries that can lead to poor perfusion and chronic pain in their lower backs. CVBT is conducting two additional trials with Cardio Vascu-Grow candidates in coronary artery disease in no-option heart patients and impaired wound healing in diabetics.

• **Chronogen Inc.,** of Montreal, received approval from Health Canada to begin clinical trials of CHGNI11, one of its Cellular Oxidative Stress Modulators. The Phase I/II proof-of-concept study will assess the ability of a topical formulation of the product to prevent cutaneous phototoxicity induced by photodynamic therapy. Chronogen expects the trial to be completed by the summer.

• **ConjuChem Inc.,** of Montreal, said preliminary data from its Phase I/II study of PC-DAC:Exendin-4 in patients with Type II diabetes was found to be safe and well tolerated, with an efficacy in glucose reduction that supports once-weekly dosing. The company reported that a longer-than-expected half-life for the drug and duration of glucose reduction indicates that an even longer dosing interval might be possible.

• **Faust Pharmaceuticals SA,** of Strasbourg, France, completed a Phase IIa trial of its lead molecule, FP001, in amyotrophic lateral sclerosis, that demonstrated the drug was safe and well tolerated, and can be administered in combination with riluzole. The company is planning Phase IIb trials of FP001 in ALS and other neurodegenerative diseases.

• **Gloucester Pharmaceuticals Inc.,** of Cambridge, Mass., said an independent data safety monitoring board reviewed interim safety data in its pivotal trial of depsipeptide product in cutaneous T-cell lymphoma, and recommended that the trial continue without any modifications. Depsipeptide is a histone deacetylase inhibitor that has received both fast-track and orphan drug designations by the FDA for CTCL and orphan drug designation from the European Medicines agency. The pivotal trial is a Phase II, non-randomized, open-label, single-arm study being conducted at 20 sties in the U.S. and Europe.

• **GPC Biotech AG,** of Martinsried, Germany, said an independent data monitoring board recommended continuing to completion the satraplatin Phase III trial SPARC (Satraplatin and Prednisone Against Refractory Cancer) in second-line chemotherapy for hormone-refractory prostate cancer. The board analyzed the efficacy data on the first 354 progression-free survival events and also reviewed the safety data from the first 593 patients who had been randomized in the trial and had completed at least one cycle of treatment. The company expects to report final results from the trial this fall. If positive, GPC Biotech plans to file a new drug application by the end of the year.

BIOWORLD® TODAY (ISSN# 1541-0595) is published every business day by the BioWorld® Publishing Group, a division of Thomson BioWorld®, 3525 Piedmont Road, Building Six, Suite 400, Atlanta, GA 30305 U.S.A. Opinions expressed are not necessarily those of this publication. Mention of products or services does not constitute endorsement. BIOWORLD® and BIOWORLD® TODAY are trademarks of Thomson BioWorld®. Copyright © 2006 Thomson BioWorld®. All Rights Reserved. No part of this publication may be reproduced without the written consent of Thomson BioWorld®. (GST Registration Number R128870672).

| | |
|---|---|
| ATLANTA NEWSROOM: | Managing Editor: **Brady Huggett.**<br>Senior Staff Writer: **Karen Pihl-Carey.** Staff Writers: **Karen Young, Jennifer Boggs.**<br>Senior Production Editor: Ann Duncan. Editorial Coordinator: Kay Torrance. |
| WASHINGTON BUREAU: | Washington Editor: **Aaron Lorenzo.** |
| WEST COAST BUREAU: | Editor: Randall Osborne. |
| EAST COAST BUREAU: | Science Editor: Anette Breindl. |
| BUSINESS OFFICE: | Vice President/Group Publisher: **Donald R. Johnston.**<br>Marketing Manager: Chris Walker. Account Representative: Bob Sobel. |
| DISPLAY ADVERTISING: | For ad rates and information, please call Stephen Vance at (404) 262-5511<br>or email him at stephen.vance@thomson.com. |
| REPRINTS: | For photocopy rights or reprints, please call our reprints department at (404) 262-5479. |

**SUBSCRIBER INFORMATION**
Please call (800) 688-2421 to subscribe or if you have fax transmission problems. Outside U.S. and Canada, call (404) 262-5476. Our customer service hours are 8:30 a.m. to 6:00 p.m. EST.

Brady Huggett, (404) 262-5408
Aaron Lorenzo, (202) 719-7816
Jennifer Boggs, (404) 262-5427
Karen Young, (404) 262-5423
Kay Torrance, (404) 262-5454
Fax: (404) 814-0759
Randall Osborne, (415) 384-0872
Anette Breindl, (304) 286-1160
VP/Group Publisher
Donald R. Johnston, (404) 262-5439
Internet: http://www.bioworld.com



ɔd, 04/26/06 08:30:46PM From: American Health Consultants To: LINDA-JEAN SCHNEIDER

## Gene Therapy
### Continued from Page 1

with causing any disease in humans. In addition, it is a simple virus with only two genes, and using recombinant AAV for transporting an HIV vaccine makes for a stable product. To date, Targeted Genetics has tested AAV vectors in more than 250 humans.

"It's a very safe delivery mechanism," said Stacie Byars, the company's director of communications. She added that tgAAC09 is injected into study subjects' arm muscles, and AAV has "long-term expression" in those cells.

Under the public-private collaboration, IAVI is funding the vaccine's development, including preclinical and clinical studies. The product is intended to protect those not infected with HIV from contracting the disease by eliciting two different types of immune responses – antibody and cell-mediated responses in T cells and B cells.

The latest trial involves a site in Zambia, a country in which a preventative HIV vaccine has never been studied, and also includes previously initiated sites in South Africa and Uganda. The center in Lusaka, Zambia, will enroll a total of 16 male and female volunteers in good health. The South African and Ugandan sites are recruiting 78 participants apiece.

In total, the multinational trial should take about 18 months to complete enrollment, after which, Byars told *BioWorld Today*, some top-line data could be available. It will test whether a second administration at six or 12 months is beneficial to immunogenicity, which is tested by measuring antibodies to antigens and CTL responses.

The African study follows positive Phase I safety data yielded from a two-year study in Belgium, Germany and India, in which volunteers received a lower-dose range of tgAAC09. IAVI estimates that there are 30 preventive HIV vaccine candidates in human trials on six continents.

On Wednesday, shares in Targeted Genetics (NASDAQ:TGEN) closed at 40 cents.

### Gene Therapy 'Not Dead'

HIV is one of many diseases being targeted by gene therapy developers, who principally have eyed serious and chronic ailments such as infectious diseases and cancer as appropriate indications for their technology. It continues to be explored aggressively, despite a share of negative publicity in recent years.

"The field is not dead," said Inder Verma, a researcher at the Salk Institute for Biological Studies in La Jolla, Calif. He recently told members of the Congressional Biomedical Research Caucus that more than 750 clinical studies of gene therapy are under way around the world, about 10 of which are in Phase III.

Conceding that the "disarmingly simple" concept of gene therapy has faced challenges related to safe and efficient delivery, and that there have been few successes to date relative to the hype, he was nonetheless optimistic about the future. Gene therapy, Verma said, "can have a major impact on human health in this century."

There is one gene therapy product cleared for sale in the world, but only in China. An oncology therapy for head-and-neck cancer, it is made by SiBiono GenTech Co. Ltd. in Shenzhen. For U.S. companies and patients, gene therapy remains in earlier research stages.

Targeted Genetics has had some success with another gene therapy product, in clinical testing for several forms of inflammatory arthritis. Preliminary Phase I data showed that seven of nine patients who received tgAAC94, which also is delivered via an AAV vector, experienced sustained improvement in signs and symptoms eight weeks after treatment. That product delivers the DNA sequence encoding an inhibitor of TNF-alpha, TNFR:Fc, to cells within arthritic joints.

Also being used to deliver genes are retroviruses, adenoviruses and herpes simplex viruses. At Lentigen Corp., a retrovirus called lentivirus is being pursued. The company was founded two years ago by CEO Boro Dropulic, who previously advanced the first lentiviral-vectored gene therapy product in clinical trials while heading another company.

Today, he said, there are five gene therapy clinical studies employing lentivirus vectors. Researchers, Dropulic said, are "gravitating" to lentiviruses because of their efficiency and stability in delivering genes.

On its website, Lentigen offers a vector-building service to researchers, who can create an account and design a lentiviral vector containing a particular gene, gene-silencing sequence or both. The company then constructs and manufactures the vector.

Lentigen – which has had a single round of venture capital, the amount undisclosed – also plans to leverage its technology for its own therapeutic purposes, and Dropulic said the regulatory environment at the FDA, which once put a hold on select gene therapy trials, has been receptive. In addition, he said the finance community has been throwing its support behind the technology, leading Dropulic to tell *BioWorld Today* that "gene therapy's time is coming." ∎

## CLINIC ROUNDUP

• **Halozyme Therapeutics Inc.,** of San Diego, initiated patient enrollment and dosed the first patient in its Chemophase Phase I/IIa trial. Chemophase is a recombinant therapeutic being developed to enhance the delivery of chemotherapy. The trial is designed to evaluate multiple intravesical administrations of Chemophase and the cancer drug mitomycin in patients with superficial bladder cancer. It will enroll up to 36 evaluable patients, and its objectives include determining the maximum tolerated dose and dose-limiting toxicities, if any, of escalating doses of Chemophase in combination with mitomycin.

To subscribe, please call BioWorld® Customer Service at (800) 688-2421; outside the U.S. and Canada, call (404) 262-5476.
Copyright © 2006 Thomson BioWorld®. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

## Inhaled Insulin
### Continued from Page 1

think that's a conservative estimate," said Adnan Butt, an analyst with ThinkEquity Partners LLC in New York. "Clearly, it's going to be a blockbuster product. If you look at sales of injectable insulin, it's in the $3 billion-plus range."

The FDA granted marketing approval for the first inhaled insulin therapy, Exubera, in January, following an advisory committee's recommendation. Marketed by Pfizer Inc., of New York, it was developed in collaboration with Nektar Therapeutics Inc., of San Carlos, Calif. Analysts have speculated that sales could exceed $2 billion five years after launch and eventually cannibalize day-to-day injectable insulin. (See *BioWorld Today*, Sept. 12, 2005, and Jan. 30, 2006.)

"It hasn't been launched yet," Butt told *BioWorld Today*. "In fact, that might end up being a good thing for Alkermes because [Pfizer] might end up preparing the market, educating the entire market" on inhaled insulin products. Pfizer expects a launch in the middle part of this year, "and Alkermes isn't that far behind their launch," he added. "It will be a lighter burden for them."

He estimates the AIR system is "easily a $1.5 billion product" in terms of peak revenue potential.

The new Phase III study is the third pivotal trial begun by Lilly and Alkermes. A Phase III safety study in 400 patients with Type I diabetes began in July, while a one-year safety study in 600 patients with Type I and Type II diabetes who have chronic obstructive lung disease and asthma began in August.

The trial, which started this week, is an open-label, non-inferiority study designed to enroll about 400 insulin-naïve patients with Type II diabetes who are taking at least one oral antidiabetic medication. The patients will be randomized to one of the two treatment groups, and the efficacy of the AIR system will be assessed for six months. The safety of it will be followed during an additional six- and 18-month period.

Alkermes and Lilly began collaborating on the program in 2001. Lilly is responsible for funding all clinical development, regulatory filings and marketing, while Alkermes is entitled to milestones and royalties.

The AIR system delivers insulin based on Alkermes' AIR pulmonary drug delivery technology. Its main advantage over competitor products is that it uses a small inhaler that can fit into the palm of a hand, Alkermes said.

"It's something you can easily put in your handbag if you're a woman or in your jacket pocket," Butt said. "The Exubera device, at this time, is much bigger," but Pfizer and Nektar could have a smaller version available in the future.

Diabetes affects an estimated 194 million adults worldwide, or 20.8 million in the U.S., and about 90 percent to 95 percent of them have Type II diabetes. About two-thirds of patients on therapies are not achieving treatment goals for controlling blood sugar. Injectable insulin has been used for more than 80 years to control glucose levels, but most patients would rather inhale their therapy with products like Exubera and the AIR system than stick themselves with needles.

"It basically makes treatment more convenient for them," Butt said.

MannKind Corp., of Valencia, Calif., also is developing an inhaled insulin product, Technosphere Insulin. The company started two Phase III studies in March, and is aiming to file for FDA approval by the end of 2008. (See *BioWorld Today*, March 7, 2006.)

MannKind has said that TI leads to a quicker insulin absorption rate than that seen with other insulin products, injectable and inhaled. It also has a shorter half-life, reducing chances of hypoglycemia. The company owns all rights to the product.

Alkermes' stock (NASDAQ:ALKS) rose 15 cents Wednesday to close at $21.56. ■

# CLINIC ROUNDUP

• **Inspire Pharmaceuticals Inc.,** of Durham, N.C., initiated a Phase II trial to evaluate its drug candidate, INS50589 Antiplatelet, in patients undergoing coronary artery bypass graft surgery, using a cardiopulmonary bypass pump. About 160 patients will receive either INS50589, a selective and reversible inhibitor of the platelet P2Y12 adenosine diphosphate receptor, or placebo via intravenous infusion. Results of the trial are expected in the first half of 2007.

• **Onyx Pharmaceuticals Inc.,** of Emeryville, Calif., and **Bayer Pharmaceuticals Corp.,** of West Haven, Conn., said Nexavar (sorafenib) tablets were granted orphan drug status for hepatocellular carcinoma by the FDA. A similar designation has been granted by the European Commission. Phase II data demonstrated that 43 percent of patients treated with Nexavar experienced stable disease for at least four months, and an additional 9 percent of patients experienced tumor shrinkage. A Phase III trial of Nexavar as a single agent is ongoing.

• **SuperGen Inc.,** of Dublin, Calif., said its drug candidate, Orathecin (rubitecan) failed to meet the pre-specified threshold for median survival, according to an interim analysis of its Phase II study of Orathecin plus gemcitabine as a first-line therapy in patients with advanced pancreatic cancer. Results show an estimated median survival of six months, with a Kaplan-Meier one-year survival rate of 27 percent. The results are not significant enough for the company to proceed to a Phase III study. SuperGen said it will evaluate the best options for further development. SuperGen's stock (NASDAQ:SUPG) closed Wednesday at $5.31, down 9 cents.

To subscribe, please call BioWorld® Customer Service at (800) 688-2421; outside the U.S. and Canada, call (404) 262-5476.
Copyright © 2006 Thomson BioWorld®. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

## FivePrime
### Continued from Page 1

dard deal," that also includes an up-front payment and research milestones, as well as development milestones and royalties if a product is licensed by Boehringer.

"We expect to do more partnerships like this one during the year," Maderis said.

Founded in 2002, FivePrime was formed to develop a protein discovery platform based on high-throughput screening.

The company spent the first couple of years bringing together all the components for system, including a collection of secreted proteins and their receptors, and the development of a complex cell-based assay to rapidly screen those proteins.

"We're looking for protein drugs for antibody targets," Maderis told BioWorld Today, adding that, with FivePrime's platform, "we're finding that we can identify many new biologics that others have missed."

She said it was that ability that attracted Ingelheim, Germany-based Boehringer, which has an established contract biologics manufacturing business and is looking to expand its own biologics pipeline.

Boehringer "has a long track record in that area," Maderis said, "so there was a great opportunity to use our discovery platform to look for new treatments for rheumatoid arthritis."

FivePrime's screening system also has yielded "our own robust internal pipeline," she said, adding that the company will be seeking partners to help develop those efforts, as well.

Lead products are in preclinical development and include FPT039, a modified growth factor receptor that targets a protein identified on breast cancer cells and also found to be overexpressed in lung, ovarian and prostate cancer. That product is expected to enter the clinic around mid-2007.

For Type II diabetes, the company is developing FPT038, a small protein designed to work by regulating glucose uptake in the skeletal muscles, a mechanism that would be insulin-sparing and would decrease blood glucose without causing hypoglycemia. FPT038 also is expected to begin human trials next year.

Though the Boehringer deal is FivePrime's first disease-specific collaboration, the company signed an agreement earlier this year with biomedical firm Biosite Inc., of San Diego. In that deal, FivePrime would provide targets for Biosite's diagnostics, and Biosite would generate antibodies for FivePrime's therapeutic program. No terms were disclosed.

To date, FivePrime has raised about $85 million in private financing. Its most recent round brought in about $45 million in February 2005. (See BioWorld Today, Feb. 10, 2005.) ■

# OTHER NEWS TO NOTE

• **3D Systems Corp.,** of Valencia, Calif., entered an exclusive agreement with **Symyx Technologies Inc.,** of Santa Clara, Calif., under which they will work on advanced materials with improved properties and performance for use in 3D Systems' rapid prototyping and rapid manufacturing solutions. 3D Systems will fund research by Symyx into new materials. Symyx will apply its high-throughput research technologies to discover novel materials for 3D Systems, and 3D Systems will have exclusive rights to commercialize the discovered materials within its field of business and will pay royalties to Symyx.

• **Aradigm Corp.,** of Hayward, Calif., said Defence R&D Canada extended a development program for the aerosolized delivery of liposome-encapsulated ciprofloxacin for bioterror-related anthrax. Specifically, the extension calls for additional funding of C$662,500 (US$587,650) from the government entity to execute a preclinical efficacy study of inhaled liposomal ciprofloxacin for post-exposure prophylaxis against inhalational anthrax. The company is developing the same formulation for its cystic fibrosis program, which also is in the preclinical stages.

• **Argos Therapeutics Inc.,** of Durham, N.C., entered an agreement with **Beckman Coulter Inc.,** of Fullerton,

Calif., granting Argos exclusive therapeutic-use rights for the soluble protein CD83, including for autoimmune disorders and transplant rejection. The patented therapeutic use of CD83 was filed initially by Dana-Farber Cancer Institute. Beckman Coulter gained license to it and under the latest agreement, retains rights to develop CD83 in diagnostics. Researchers working with Argos at the University of Erlangen in Germany discovered that CD83 is an immunosuppressant and able to inhibit paralysis in a model of multiple sclerosis in both an active and pre-treatment setting.

• **Biogen Idec Inc.,** of Cambridge, Mass., reported its first-quarter earnings. Total revenues were $611 million vs. prior year $588 million, an increase of 4 percent, driven mainly by Rituxan (rituximab) revenues of $183 million from its joint business arrangement with South San Francisco-based **Genentech Inc.** (U.S. net sales of Rituxan increased 8 percent to $477 million, as reported by Genentech), and Avonex (interferon beta-1a) worldwide sales of $393 million. Its GAAP first-quarter diluted earnings per share were 36 cents. Non-GAAP EPS were 55 cents, which beat Thomson First Call consensus estimates of 48 cents per share. It had GAAP net income of $123 million in the first quarter. Revenues from other products were $13 million and royalties were $21 million. It gave a financial guidance of non-GAAP earnings per share for 2006 in the range of $1.95 to $2.10. The company's stock (NASDAQ:BIIB) fell 45 cents Wednesday to close at $43.63.

To subscribe, please call BIOWORLD® Customer Service at (800) 688-2421; outside the U.S. and Canada, call (404) 262-5476.
Copyright © 2006 Thomson BioWorld®. Reproduction is strictly prohibited. Visit our web site at www.bioworld.com.

ed, 04/26/06 08:30:46PM From: American Health Consultants To: LINDA-JEAN SCHNEIDER

# Replikins
*Continued from Page 1*

former faculty member of Harvard and Boston University School of Medicine.

He said the find was "based upon the recognition of a chemical change, or peptide change, that occurs with rapid replication," and the ability to track those changes.

Flu viruses were the first to be studied with the method, mostly because researchers were able to access epidemiological data from the Centers for Disease Control and Prevention in Atlanta going back almost 100 years.

Using Replikins FluForecast computer program, the company was able to analyze peptide sequences from those strains, which included the strain of H1N1 subtype that caused the Spanish flu pandemic of 1918. Analysis revealed that, prior to the outbreak, there was a strain-specific increase in replikin count.

"We had a chance to compare the absolute levels of the peptides in quantitative amounts to the occurrence of epidemics," Bogoch told *BioWorld Today*, "and we were pretty surprised to find that there's a point-to-point correlation between the high points of the epidemics" and high replikin counts.

The FluForecast program is designed to measure the peptide changes, which typically occur one year to three years before the epidemic itself, Bogoch said.

For example, the outbreak of severe acute respiratory syndrome (SARS) caused by a coronavirus, which appeared for the first time in 2003, could have been predicted using the technology, he said.

Because SARS had no data history, the company was not able to track the specific virus, but a look at the whole coronavirus group showed that the replikin count "stayed quite low in the dormancy area of 1 to 2 replikins per 100 amino acids" for several years before 2002 when it suddenly increased by three or four times that level, Bogoch said. "Then, in 2003, out pops the SARS epidemic."

The count fell again, and no case of SARS has been reported since 2003.

It's like a "factory" that is the busiest "before the product is released," Bogoch said, "which is good, because it gives us an opportunity we haven't had before – to see in advance of what's coming and to see it in quantitative terms."

The discovery is made even more valuable by the threat of a potential avian flu pandemic.

Bogoch said the technology was able to predict three of the avian flu epidemics since they first emerged in Hong Kong in 1996-1997.

Following early reports, Hong Kong officials were meticulous about destroying birds that could carry the virus, and the replikin count fell to normal levels in 1997, ending the threat, for a little while.

"They declared victory, but our replikin count said that it was back up again in 2002 and 2003," Bogoch said, adding that the count rose again before the virus emerged in Vietnam in 2004 and "since then, the replikin count has stayed up and hasn't gone down yet."

As far as whether that could signal a future pandemic, Bogoch said "we do not have any clue this is about to end."

Replikins was formed around the program, but predicting a potential pandemic is only the first step. In addition to counting replikins, the FluForecast technology also records which of the structures are most prevalent in any given strain, providing researchers with a specific target at which to aim a vaccine.

"So instead of going blind, you have a target [on which] to build your vaccine," Bogoch said.

He added that the company also works with synthetic vaccines to avoid the chance for protein contamination that comes from using part or all of the actual virus to synthesize a treatment.

One of the most notable instances of contamination occurred in 1976, when people were "rushing to get inoculated for the swine flu epidemic," before the vaccination program was cancelled after 25 deaths and a rise in Guillain-Barre syndrome were linked to the vaccine, he said.

With a synthetic vaccine that's targeted to specific amino acids, "we have a better chance of knocking out the organism, and there are no contaminants," Bogoch said.

At this time, the company is "about halfway there," he added. "We know the [vaccine] works to make antibodies, but the question is does it protect against [the virus]?"

To answer that question, Replikins is preparing to begin preclinical trials in several countries to test the vaccine technology in animals. If the results are promising, the vaccines could enter the clinic in the next six to 12 months.

The company's FluForecast also could help governments predict which seasonal flu strain is most likely to hit in the coming years to make sure vaccine stockpiles include the most effective vaccines.

Beyond influenza, Replikins anticipates using its program for measuring rapid replication to address other infectious diseases such as AIDS, foot-and-mouth disease and malaria.

The company recently completed its first financing, which Bogoch described as "very generous." It has a "handful" of employees, with expectations of hiring additional staff to set up labs in areas outside the U.S.

"We'll be very busy in the coming year," Bogoch said, "testing as many of these diseases as possible to see if we get good antibody responses to our vaccines based on the replikin structure." ∎

əd, 04/26/06 08:30:46PM From: American Health Consultants To: LINDA-JEAN SCHNEIDER

# OTHER NEWS TO NOTE

• **Cellegy Pharmaceuticals Inc.**, of Huntingdon Valley, Pa., said the FDA's Cardio-Renal Advisory Committee was split on requiring more data for the company's new drug application for Cellegesic (0.4 percent nitroglycerin ointment), for reducing pain associated with anal fissures. Six committee members voted for approval, while six other called Cellegesic approvable pending another efficacy study.

• **Cetek Corp.**, of Marlborough, Mass., entered an agreement to provide its natural products library for drug discovery work by Lexicon Genetics Inc., of The Woodlands, Texas. Lexicon will screen the library, which contains more than 50,000 samples, against a specified number of targets from Lexicon's Genome5000 program, which uses its gene knockout technology to discover the physiological functions of 5,000 potential drug targets. Financial terms were not disclosed.

• **Cytori Therapeutics Inc.**, of San Diego, received a $1.5 million payment for the option it granted to Tokyo-based **Olympus Corp.** for exclusive right to negotiate an adipose-derived stem and regenerative cell commercialization collaboration, which would include distribution rights to the Celution system. As part of the agreement, signed in February, Olympus will conduct market research and pilot studies in collaboration with Cytori over a 12- to 18-month period.

• **Emisphere Technologies Inc.**, of Tarrytown, N.Y., said a federal court granted its application and. ordered **Eli Lilly and Co.**, of Indianapolis, to assign to Emisphere the patent application filed by Lilly in February 2002 for a patent on the use of Emisphere's technology with GLP molecules. The court reaffirmed its January ruling that the GLP patent application belonged to Emisphere under the terms of the agreements in effect between Lilly and Emisphere at the time the application was filed. In addition, a court statement said that Lilly's likelihood of success on appeal is not high, Emisphere said.

• **Eurogentec SA**, of Liege, Belgium, acquired a license to array patents developed by Edwin Southern, the founder of **Oxford Gene Technology Ltd.**, of Oxford, UK. The intellectual property represents the fundamental patents covering the manufacture and use and marketing of oligonucleotide microarrays. Financial terms were not disclosed.

• **Evotec AG**, of Hamburg, Germany, said the management and supervisory boards decided to increase its share capital against a contribution in cash from authorized capital, exempting pre-emptive rights. DZ Bank AG, of Frankfurt, Germany, will act as sole lead manager and offer 5.2 million new shares to institutional investors in Europe and the U.S., with proceeds from the offering to allow Evotec flexibility to develop its projects and target higher value creation before partnering. Evotec is developing a pipeline of central nervous system drugs to target insomnia and Alzheimer's disease.

• **ImQuest Pharmaceuticals Inc.**, of Frederick, Md., signed an exclusive worldwide license for the development and commercialization of a series of anticancer agents discovered and patented by **Samjin Pharmaceutical Co. Ltd.**, of Seoul, South Korea. ImQuest will complete preclinical and clinical drug development programs for the agents; Samjin will retain the rights to manufacture and distribute FDA-approved cancer drugs from the series in The Republic of Korea. The piperazine series has been shown in both cell-based and small-animal model studies to have biological antitumor activities. Financial terms were not disclosed. The companies also have a deal on HIV candidates. (See *BioWorld Today*, March 1, 2006.)

• **Nabi Biopharmaceuticals**, of Boca Raton, Fla., signed an agreement with Sanofi Pasteur, part of the **Sanofi-Aventis Group**, of Paris, to fractionate human plasma used to produce Imogam Rabies-HT (rabies immune globulin [human] USP heat treated), which provide passive protection when given immediately to individuals exposed to the rabies virus. Nabi will conduct the work at its Florida manufacturing facility and ship the partially manufactured product to Sanofi Pasteur for completion of production at its manufacturing facility in Lyon, France. Financial terms were not disclosed.

• **NPS Pharmaceuticals Inc.**, of Salt Lake City, and **Nycomed Group**, of Roskilde, Denmark, said the European Commission granted marketing authorization for Preotact (parathyroid hormone [rDNA origin] for injection). Preotact is the European brand name for Preos, which NPS licensed to Nycomed in 2004 for development and marketing in Europe. Preotact is approved to treat postmenopausal women with osteoporosis at high risk for fractures. It will be launched in Europe later this year. NPS received an approvable letter for Preos from the FDA in March. (See *BioWorld Today*, March 13, 2006.)

# ADVERTISE HERE

...and reach high-level biotechnology professionals every day!

**For advertising opportunities in *BioWorld Today*, please contact Stephen Vance at (404) 262-5511 or stephen.vance@thomson.com**

# EXHIBIT G

## JOINT DEFENSE, COMMON INTEREST, AND
## INFORMATION SHARING AGREEMENT

This Joint Defense, Common Interest, and Information Sharing Agreement ("Agreement") is entered into by and between Prosper Benhaim, William J. Futrell, Marc H. Hedrick, Adam J. Katz, Ramon Llull, Hermann Peter Lorenz, Min Zhu and MacroPore Biosurgery (collectively "the Parties").

The Parties agree that they have ongoing common interests arising from an adversary proceeding filed on October 29, 2004, styled University of Pittsburgh of the Commonwealth System of Higher Education v. Marc H. Hedrick, Prosper Benhaim, Hermann Peter Lorenz and Min Zhu, Case No. CV-04-9014, United States District Court for the Central District of California ("the Pittsburgh litigation"). A copy of the complaint is attached hereto as Exhibit A. As part of this litigation, the plaintiff seeks a determination of the true and correct inventorship of U.S. Patent No. 6,777,231 ("the '231 patent"). A copy of the '231 patent is attached as an exhibit to the complaint.

Because of their common interests, including that relating to establishing and identifying the correct inventors for the '231 patent and any related patent applications, and to facilitate discussions between the Parties, the Parties believe that sharing of otherwise Privileged and Confidential information between and among themselves concerning matters of common interest is essential in defense or otherwise to respond to the Pittsburgh litigation. The Parties do not intend to waive any evidentiary privileges as to these communications, but rather intend to share otherwise Privileged and Confidential information without loss of evidentiary privileges. The Parties' intent to share information is based upon their expectation that any information shared under this Agreement will be kept confidential and not disclosed to any person that is not a Party, except in accordance with the provisions of this Agreement. This Agreement also confirms that,

to the extent the Parties have already been in communication since the commencement of the Pittsburgh litigation, the communications are subject to this Agreement.

Therefore, the Parties hereby agree as follows:

1.     SHARING OF PRIVILEGED AND CONFIDENTIAL INFORMATION – This Agreement applies to the sharing of Privileged or Confidential Information between or among the Parties relating to the Pittsburgh litigation.  Except as provided herein, any Privileged or Confidential Information that is shared between the Parties shall retain its character as Privileged or Confidential Information notwithstanding the occurrence of such communication. Information that was not Privileged or Confidential Information before it was shared between the Parties will not become Privileged or Confidential Information solely by virtue of its having been shared pursuant to this Agreement.  However, there shall be a rebuttable presumption that information communicated between the Parties, even if not privileged or protected by the work product doctrine, is confidential within the meaning of this Agreement.  The Parties do not intend to and do not waive any privileges or rights, including, but not limited to, the attorney-client privilege and attorney work product rights, by virtue of the communication of any Privileged or Confidential Information pursuant to this Agreement.

2.     NO REQUIREMENT TO DISCLOSE INFORMATION - This Agreement does not require any Party to share any particular information with any other Party.

3.     NO DISCLOSURE TO THIRD PARTIES OR THE UNIVERSITY OF PITTSBURGH – No Privileged or Confidential Information provided by any Party to any other Party pursuant to this Agreement shall be disclosed to third parties (including, without limitation, any litigant in the Pittsburgh litigation not a party hereto) by any Party receiving such information unless the receiving Party has first obtained the written consent of the Party who provided the information pursuant to this Agreement.  Nothing in this Agreement shall preclude

any Party from communicating Privileged or Confidential Information to his or her counsel, providing that the counsel does not also represent the University of Pittsburgh.

4.    <u>INDEPENDENT INVESTIGATIONS</u> – This Agreement shall not govern information that is not obtained under this Agreement. The Parties are free under this Agreement to conduct separate witness interviews and otherwise undertake independent investigative or discovery efforts.    Nothing in this Agreement shall foreclose any Party from obtaining information that is not privileged or confidential through use of discovery procedures. Any Party undertaking such separate investigative or discovery efforts is free to disclose any information it obtains pursuant to those independent efforts to any third parties or to use the information in any manner the Party desires, without the consent of any other Party, whether or not such separate investigative or discovery efforts arose in part or entirely from information or leads obtained as a result of communications protected by this Agreement.

5.    <u>DISCOVERY</u> – In the event that any Party receives from any person (including other Parties to this Agreement) a subpoena or a document request pursuant to the Federal Rules of Civil Procedure or other federal or state rule or statute, or judicial, legislative or executive order that appears to call for the disclosure or production of any Privileged or Confidential Information, the Party shall, in addition to preserving and invoking any applicable privilege as required by this Agreement, immediately notify, unless prohibited by law, all Parties to this Agreement of the existence of the request, demand or order, and shall not voluntarily surrender any Privileged or Confidential Information without providing, to the extent legally permissible, all Parties a reasonable opportunity also to protect their respective interests in an appropriate forum.

6.    <u>ROYALTY SPLITTING</u> – All of the Parties to this Agreement, but excluding MacroPore Biosurgery which is not a party to this Royalty Splitting paragraph for any reason,

agree that a separate royalty splitting agreement shall be prepared, executed and implemented. The separate royalty splitting agreement shall provide that any and all royalties, monies and/or other forms of compensation, received by or paid to any Party, from and by the licensing of any and all United States or foreign patent applications and/or issued patents that claim priority to any or all of the three following "Priority Applications" – provisional application no. 60/123,711, filed on March 10, 1999, provisional application no. 60/162,462, filed on October 29, 1999, and PCT No. PCT/US00/06232, filed on March 10, 2000 – including, without limitation, U.S. Patent No. 6,777,231, and assigned to the University of Pittsburgh of the Commonwealth System of Higher Education and/or The Regents of The University of California and/or any successor-in-interest of the ownership rights of either of these Universities ("the Royalty Patents"), shall be divided equally among all of the Parties. The Royalty Patents shall exclude any patent wherein the issued claims are solely directed to new matter that was not described and enabled in the Priority Applications. The Parties further agree that the separate royalty splitting agreement shall be amended if any additional individual who is determined to be an inventor of the subject matter set forth in the Priority Applications decides to enter into the separate royalty splitting agreement.

7.    WITHDRAWAL FROM AGREEMENT – If the interests of any Party shall become materially adverse to any other Party hereto, that Party shall immediately notify in writing all other Parties of the adverse interest and withdraw from the Privileged and Confidential Information obligations of this Agreement. In addition, any Party is free to withdraw from the Privileged and Confidential Information obligations of this Agreement upon written notice to all other Parties. This Agreement shall not be operative with respect to communications subsequent to a withdrawal with any withdrawn Party, but it shall continue to protect all communications covered by this Agreement prior to the remaining Parties' receipt of

LA1 631316v1                    4

notification of withdrawal. Upon demand, the withdrawing Party, shall immediately return to the remaining Parties all copies of documents received from the remaining Parties pursuant to this Agreement.

8.    IRREPARABLE HARM – The Parties agree that disclosure of any Privileged or Confidential Information in violation of this Agreement will cause the Parties to suffer irreparable harm for which there is no adequate legal remedy available. In addition to any other remedy that may be available, each Party acknowledges that specific performance and immediate injunctive relief is an appropriate and necessary remedy for violation or threatened violation of this Agreement.

9.    LEGAL REPRESENTATION – Nothing in this Agreement shall be construed to affect the separate and independent representation of each Party by his or her respective attorney(s) according to what his or her attorney(s) believe to be in his or her client's best interest.

10.    EXECUTION AND MODIFICATION – This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document by all Parties as listed below. This Agreement will be effective between and among any signatories to the Agreement, immediately upon signing the Agreement, and even if all of the identified signatories do not enter into this Agreement. This Agreement may be modified only by a written amendment signed and agreed to by all signatories to this Agreement who have not withdrawn.

Dated: _____, 2004    By _____
                                                                Prosper Benhaim

Dated: _____, 2004    By _____
                                                                William J. Futrell

LA1 631316v1                                            5

Dated: _____, 2004        By _____
                                        Marc H. Hedrick


Dated: _____, 2004        By _____
                                        Adam J. Katz


Dated: _____, 2004        By _____
                                        Ramon Llull


Dated: _____, 2004        By _____
                                        Hermann Peter Lorenz


Dated: _____, 2004        By _____
                                        Min Zhu


Dated: _____, 2004        By _____
                                        MacroPore Biosurgery

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNIVERSITY OF PITTSBURGH, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) Misc. Action No. 06-080-SLR |
| v. | ) |
| | ) (Litigation pending in U.S. District Court, |
| MARC H. HEDRICK, PROSPER | ) Central District of California – Case No. |
| BENHAIM, HERMANN PETER | ) CV04-9014-CBM (AJWx)) |
| LORENZ, and MIN ZHU | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## ORDER

AND NOW, this ___ day of _____, 2006, upon

consideration of the Motion of the Plaintiff University of Pittsburgh to

Compel Olympus-Cytori, Inc. to Produce Documents Requested Pursuant to

Subpoena Duces Tecum, and any opposition thereto, it is hereby ORDERED

that the Motion is GRANTED.  It is FURTHER ORDERED that, no later

than five (5) business days from the date of this Order, Olympus-Cytori shall

provide to plaintiff University of Pittsburgh all documents responsive to the

Document Requests of plaintiff University of Pittsburgh.


_____
The Honorable Sue L. Robinson
Chief Judge, United States District Court

**UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNIVERSITY OF PITTSBURGH, | ) | Misc. Action No. 06-080-SLR |
| | ) | |
| Plaintiff | ) | (Litigation pending in U.S. District Court, |
| | ) | Central District of California – Case No. |
| v. | ) | CV04-9014-CBM (AJWx)) |
| | ) | |
| MARC H. HEDRICK, PROSPER | ) | |
| BENHAIM, HERMANN PETER | ) | |
| LORENZ, and MIN ZHU | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

On May 1, 2006, I served on interested parties in said action the within:

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL RESPONSES TO ITS SUBPOENA DUCES TECUM ON THIRD-PARTY OLYMPUS-CYTORI, INC., MOTION REQUESTING ORAL ARGUMENT AND MOTION TO FILE DOCUMENTS UNDER SEAL**

by transmitting a true copy of said document by electronic mail and by United States First Class Mail as stated on the attached service list.

Executed on May 1, 2006, at Philadelphia, Pennsylvania.

I declare under penalty of perjury under the laws of the State of Pennsylvania that the foregoing is true and correct.

| | |
|---|---|
| David J. Kessler | |
| (Type or print name) | (Signature) |

### SERVICE LIST

**James B. Lewis**
Bingham McCutchen
1900 University Avenue
East Palo Alto, CA 94303-2223
650-849-4852
Email: james.lewis@bingham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer M. Phelps**
Bingham McCutchen
355 S. Grand Ave., 44th Floor
Los Angeles, CA 90071-3106
213-680-6400
Fax: 213-680-649
Email: jennifer.phelps@bingham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M. Olson**
Sandra S. Fujiyama
Sidley Austin Brown & Wood
555 W. 5th Street, Suite 4000
Los Angeles, CA 90013-1010
213-896-6000
Email: jolson@sidley.com
Email: sfujiyama@sidley.com
*LEAD ATTORNEYS*
*ATTORNEYS TO BE NOTICED*

**Steven J. Balick**
John G. Day
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
Email: sbalick@ashby-geddes.com
Email: jday@ashby-geddes.com
*LEAD ATTORNEYS*
*ATTORNEYS TO BE NOTICED*